Good morning, Your Honors, and may it please the Court, Brian Layton on behalf of the plaintiffs' appellants, Kathy Lewis and her three younger brothers. I realize that the emotional argument addressed in the brief and the vigor in which this oral argument is delivered cannot change existing case law, but it can have a tendency to distinguish cases if those cases are distinguishable. Well, what's your strongest argument? The strongest? There's two strongest arguments. The three cases relied upon, my colleague and Judge Carlton below, are completely distinguishable in this case, the facts of this case. And secondly, the Bureau of Indian Affairs has assumed jurisdiction over the constitution of the Table Mountain Rancheria for approval of that constitution, which necessarily includes my clients, and I think primarily because it was Table Mountain in a class action lawsuit representing my clients as class action plaintiffs that got the Secretary of Interior to agree that Table Mountain is a recognized tribe with full membership for those class plaintiffs. Well, doesn't that suggest, because the district court was very sympathetic, but doesn't that suggest that your remedy is administrative rather than judicial? Your Honor, the administrative remedy is what the Bureau of Indian Affairs has ignored. The Louises have been requesting BIA to act. Since they learned about the 1983 judgment in Table Mountain v. Watt out of San Francisco, the northern district, BIA has ignored their pleas. BIA ignored their Freedom of Information Act request to get documents. They, the Louises, requested them to act at every turn. What happened to the Freedom of Information Act suit? We were requesting documents as to their constitution, et cetera. Only when we filed this complaint did they actually provide the documents. Oh, they provided it when you filed it. And then moved to dismiss the Freedom of Information Act request because it's moved. So they have attempted that. But the three cases primarily relied upon by the district court, in fact, totally relied upon my colleague and the district court, Santa Clara Pueblo v. Martinez, Smith v. Babbitt, and the Ordinance 59 are clearly distinguishable. And in fact, the Santa Clara Pueblo case actually supports district court jurisdiction in that case, in this case. There, the plaintiff attempted to change the tribe's constitution. There, a tribal remedy existed through a tribal court. There, there was no previous case where the tribe had waived sovereign immunity with respect to its membership. There, it did not involve the tribal revenue allocation plans, which now the Indian Gaming Commission and the BIA have to oversee to ensure that when casino profits are distributed without a violation of equal protection or due process. The court said in cases where the tribal constitution required department approval, then resort to the agency can occur. We have resorted to the agency. They have done nothing. And then pursuant, since we're not seeking money damages from the government, then under 702 of the Administrative Procedures Act and Section 1331 of Title 28, the court has jurisdiction to compel the agency to act when the act is being illegally withheld or they are not acting. The district court below said government sovereign immunity, but as I pointed out in my opening brief, this court clearly held after the APA was amended to add Section 702 that a suit against the government not seeking money damages can be held under Section 1331, which is a federal question jurisdiction, to compel the agency to act when it has a duty to act. In this case, because of the Table Mountain versus Watt decision in 1983, when the Secretary of Interior agreed and stipulated to a judgment, the Table Mountain will be recognized as a bona fide California Indian tribe, and the membership in that tribe will consist of the list. The argument you make is very interesting, but I keep reading over and over again Santa Clara Pueblo versus Martinez, and that seems to just trump everything that you say. I mean, doesn't that really just answer the question, unfortunately, for your side? No, it doesn't. Because when you're talking about membership, that's an intramural tribal issue, period. If I can... Go ahead. To answer the Court's question, in that case, remember, that tribe did not need secretarial approval. That tribe had a constitution in place, and Ms. Martinez was taking the action to court to force the tribe to change their constitution. The constitution as it exists for Table Mountain includes my clients' members. Those all strike me as differences without a distinction. If you were writing our opinion, what is the guiding principle that you would articulate that would apply to your case and might apply to a future case? The guide that has never been resolved in any court opinions is that when a tribe seeks recognition in court, is waived sovereign immunity with respect to that issue. That issue was decided that that tribe was a bona fide tribe, as opposed to the historical tribes since day one, the Arapahos, Navajos, et cetera. The California, the Secretary of Interior, did not recognize this tribe, tried to take away their rights, and so the tribe went in representing my clients. And when that stipulated judgment also has in it the membership shall be, and we are those members. We're not trying to get them to change anything. What's the rule that you're asking us to? Is that when a tribe seeks recognition, proclaiming who the members of that tribe will be, and the court and the government enter into a stipulation with the tribe stating this is a tribe and these are its members, they have to abide by it. Okay, and whereas in Santa Clara Pueblo, you had a dispute because the tribe was barring certain people from membership. Yes. And the Supreme Court said there just isn't any way that you can get relief. Right. And you say that is different because the tribe there had never sought recognition? That's because the tribe was already recognized, had a constitution that had been in place for years, and Mrs. Martinez did not like one of the enrollment ordinance part of the constitution and requested the court to intervene and change that constitution. We are not seeking that. Now, also that case was a suit under the Indian Civil Rights Act. Right. Okay. This is not a suit under the Indian Civil Rights Act. What are we suing under here? We're suing under 1331 and 702 to force the agency to comply with the judgment, Table Mountain v. Watt, and in fact, as shown in our excerpt of record, is when Table Mountain drafted a constitution following the Table Mountain v. Watt decision in 1983, the Bureau of Indian Affairs says, no, you can't do it that way, you have to comply with Watt. We are going by the base role of the 1959 base role, the distributees, and all of the descendants of those distributees. We are descendants of those distributees. You're essentially saying that what you're trying to get, the relief you're trying to get here, is simply compliance with the original judgment that they agreed to? That is correct. And the other distinction about Santa Clara v. Pueblo, the court was wrestling with whether or not a court has jurisdiction under the Civil Rights Act to enforce the Civil Rights Act that requires equal protection and due process. They said in that decision, we don't believe that courts should be involved in that, because Mrs. Martinez can go to the tribal court. There was a tribal court. She didn't exhaust it through a tribal court, which are three independent, objective Indians that make a determination that are not connected with that right. There is no tribal court in California for Table Mountain. So the sole decision being made, a greedy decision, is Cathy Lewis' and her brother's relatives, everybody that is a recognized member, their relatives, aunts, uncles, cousins, saying, well, we don't want Cathy and her brothers in. But we'll take this 18-year-old over here, who is far way down the descendant list than my clients are, and there's no tribal court that we can go to, no disinterested court. But you're not arguing that if a tribe doesn't provide a court, that all membership disputes have to be resolved in federal court, are you? No, I'm not saying that. I'm not saying that the unique thing about here is Table Mountain v. Watt, the tribe. Are you saying if there were a tribal court, that you would have to go to the tribal court? No. Well, that would be a decent remedy, but to me, enforce the judgment issued in 1983. I would assume you would say that even if there were a tribal court, that federal court would still be available in this instance because of the judgment. Because of the strong interest of the federal courts to enforce their own judgments, even decades later like that. You distinguish every case there is, and Judge Carlton tried to. Is there any case that is other than what you say Santa Clara says? I cited some cases in my brief, the reply brief, and I think they're at pages 14-16. Oregon v. United States, which is a Ninth Circuit case, McClendon, which involved the fact that when tribes intervene in suits or initiate a suit, they have waived sovereign immunity and that it's U.S. v. Oregon, that's page 14 and 15 of my reply brief, that where the tribe intervened in a court, in a court action, became a party to that, just like Table Mountain was here. Years later, an action was brought to enforce the decree issued by the court, and this court in 1981 in that case said that the tribe waived its sovereign immunity, and when the tribe voluntarily enters the suit, they are, quote, fully bound by all further court orders. Yeah, but none of those cases deal with something as essential as who belongs to the tribe and who doesn't. Those don't trump the membership rule. Those are different circumstances. Except that what's not different, Your Honor, is the fact that That, I gather, is what you're saying is an open question. That's the open question, because in this case, the tribe went to this court. In Northern District of California, didn't appeal. They entered into a stipulated judgment and said, Please recognize us and our list of members as a tribe. They got what they wanted. We were necessary party plaintiffs represented by a class of plaintiffs. So what the court would be saying otherwise is the court does not have continuing jurisdiction to enforce orders against a tribe who voluntarily started the suit. The court can't tell a tribe who its members are and who its members aren't. But you want to respond to that? Well, I didn't want to interrupt Your Honor. I'm just wondering whether you're saying that that's what the purpose of the original suit was when they tried to get recognition. What they attempted to do is to get recognition to have the United States recognize Table Mountain as a tribe. And no residency requirements, the tribe shall consist of all those on the 1959 base roll as determined by the Secretary of Interior, the distributees of the distribution plan, and all of their descendants, direct descendants. Kathy Lewis's and her brother's grandfather was the Table Mountain chief in the 1950s. Her grandfather was an original distributee on the 1959 base roll. What reason does the tribe give for refusing to recognize these people as members? They give no response. They finally said to my clients, Oh, by the way, you have to make an application. That was in the year 2000. They applied. They said all your paperwork's here. I mean, it's not like rocket science. Everybody that makes the decision on the tribe are aunts and uncles of my clients. Okay, you have about five minutes left.  Thank you, Your Honor. Good morning, and may it please the Court. My name is Deborah Luther, and I'm appearing here on behalf of the appellees. And I recognize that there is a certain irony in my appearance before you as a member of the U.S. Attorney's Office, which typically prosecutes criminals, and often we hear them saying, You've got the wrong guy. And I'm here saying, They've got the wrong defendant. The United States does not play a role in the membership determinations of a tribe. It does not play a role in enforcing a tribe's governing documents, and it does not play a role, in this instance, in the matters between Table Mountain Rancheria and the Lewises. So what's their remedy? Their remedy is with the court. There is a tribal council. First of all, there's an enrollment committee, apparently. And I have to say apparently because the government does not have these documents. Now, the Lewises have purported to present them, but we have no way of knowing whether these are, in fact, the current governing documents, the current enrollment ordinance. But be that as it may, what we have at this time indicates that there is an enrollment committee, there is a tribal council, and that there is a general council, the tribal council apparently being elected from among the members. But have you responded to them and told them what the way – is there any document here that shows what they should do? We have argued it in our briefs, and we have said – No, I mean, this is a lawsuit. Correct. Have you had negotiations? Have you talked about this? Have you told them this is the part of the tribe, this is the organ of the tribe that you are to go to? I mean, the federal government has a certain responsibility over tribes. Are you saying have we discussed this with the Lewises or discussed it with the tribe? With either one. Is there any documentation here? I know I have spoken personally with opposing counsel about this matter. No, no. But prior to that, whether my client has, I am not aware one way or the other, to be honest. You don't know what communications the federal government has had with the plaintiffs here? I do not. I know what my communications have been both with the tribe and I do not know what the Bureau of Indian Affairs. Ordinarily, what you're saying would be correct if you follow the Supreme Court's guidance and our own guidance. The other side says this is a peculiar case because of this lawsuit and what the tribe requested from the federal government. What's your precise answer to that? I have a couple of answers to that. Number one, when the tribe brought suit back in 1980, actually I think it was 1979 in the northern district, that tribe was seeking William's statement as a federally recognized tribe. It had been terminated by an act of Congress in 1959 and had proceeded through the intervening years without status as a federally recognized tribe and its people were determined to be ineligible for any services from the United States. When they filed suit, they were seeking two things. One, they were seeking William's statement as a federally recognized tribe and secondly, to the extent that they designated people as a class, they were seeking to have those people not recognized per se as tribal members by the United States but as persons who were now reinstated as eligible for federal benefits. When was the Indian Gaming Act passed? That was in the late 1980s, I believe 1988. When was the casino? I don't know when the casino was built but the tribe was recognized, were reinstated in 1983. The Indian Gaming Regulatory Act was passed, I'm fairly certain, in 1988 and I believe they built their casino, I want to say sometime in the 1990s but I really don't know when. Is that what this is all about? Yes. The distribution of approximately $15,000 a month to members of the tribe? We don't know. The Bureau of Indian Affairs did not play a role in money that flowed. It's over money. Yes. Okay. Absolutely. Is that why the status was sought, the tribal status was re-sought? Because there was a lot of movement for Indian gaming all during the 80s. I think there were a lot of reasons for seeking reinstatement and frankly, recognition, reinstatement of recognition to those tribes that were terminated back during the termination era of the 50s and 60s really began in the 70s. I believe we had the first gaming case coming out of Southern California, the Cabazon case, around 1980, I believe. But reinstatement of federal recognition was something that really began before that. And I could sit here and I could speculate, really, on all the various reasons that tribes might want reinstatement. But I do believe that chief among those reasons was a heartfelt belief in their cultural identity and the need for services from the United States during that time. Even where there's no residence requirement. Even- Where there's no residence requirement. I've been to the Santa Clara Pueblo and it's a very famous place and it has traditions and it's been handed down for generations. I gather this is not- What? Is this a tribe like that? I actually have not very much familiarity with Table Mountain. But you raised an interesting point about Santa Clara Pueblo that I wanted to address and that is when Julia Martinez sued on behalf of her children, she was suing because the tribe had actually changed its membership requirement. And so, perhaps understandably, she was disgruntled having raised her family on the reservation and thinking that her children were going to be members. And this is not- They say there's no change here. This is a completely different thing because these are the people who originally thought that they were going to be recognized. Right. Well, we're assuming there has been no change. I mean, we don't know what the current status is and that kind of- The suit isn't alleging that there's been a change. The basis of the suit, as I understand it, is that there's been no change. There's just a refusal to comply. Well, the problem isn't that we don't have the tribe here. And the Bureau has no mechanism for requiring the tribe to tell the Bureau what its membership is or tell the Bureau what its criteria are. Back, if you take a look at what happened in the 1980s in terms of the approval of the Constitution, you will see in the reply that was included in the appellant's excerpt of record that the Bureau made recommendations. And that is the function of the Bureau, is to provide assistance to the tribe. I guess what's bothering me is that the BIA is supposed to be providing assistance and it's supposed to be helping and it's supposed to be all these things. And here, we seem to be just-the government seems to be just erecting a brick wall. Immunity is being used as kind of a brick wall that people can just bump up against and nobody can be sued. That doesn't seem like that's the whole purpose of the relationship between the government and the tribe. Well, I'm not saying that that assistance was not provided. If you look in the file, you will see that this case came in. We promptly filed a motion to dismiss the lack of subject matter jurisdiction. And I take the responsibility that I do not ask my client, what have you done? They may very well have tried to speak with the Lewis's or speak with the tribe or speak to both and try to figure this out. But I think this takes us back to what is really the point here, that this is an internal tribal matter. And the policy that the Congress has put in place and that the Department of Interior and the Bureau of Indian Affairs has been following is one of respecting and then encouraging the tribe to be independent. And one of the themes that runs throughout the history is that the government, whether it's worked well or badly or for good purposes or bad, but has been to help tribes establish their own mechanisms for resolving disputes. And here there seems to be nothing. I don't think that is true, Your Honor. Without due respect, I think just. There's nothing? Well, I'm not sure what you're referring to, but the tribe. That's not the history. No, no. But the tribe does have mechanisms. If we have the current Constitution, there is the tribal council and there is the general council. They may not have a tribal court, which would comport with what you might call white men. Then you have a conflict of interest, don't you? What would that be, sir? Well, I mean, you have people who are there who are members of the tribe. And if people who should be members of the tribe are excluded and they bring those people in, then there are more people to divide the pie, right? Correct. Presumably. If, in fact, that's what they're doing. Well, you do have a conflict. So what do you do in a situation where you have a small group who takes control of a tribe and then that small group decides that they're going to limit the number of members? They have too many members. There are too many people there. And they select a certain family and they say, well, we've looked at your situation and we don't think that you're members of this tribe. And so you're gone from our rolls and our lists. What remedy do those people have then? Again, it would be with the tribe. Well, but the tribe is, you know, they're controlling all of this. With all due respect, in many ways, that's what the United States does. That's what the United States does in establishing immigration rules. You control the number of people that come into your borders. So I'm not saying that's what's happening here, but I'm saying there are parallels. That's a poor analogy, I think. The point being that it is a tribe's prerogative to control its membership. So you can, you know, the whole thing's over money, you see. It used to be. That means stealing, essentially. That's essentially in the context of this case. If you take the allegations, which we have to, I assume, as correct, then it's a license to steal. But the bottom line, really, I think what this comes down to is it's up to Congress to legislate in this area. Because right now, as the case has been filed under the Administrative Procedures Act, there is no federal law that is to be enforced here. Plaintiffs are seeking to compel. Well, they say there's a judgment. A document? A judgment. A stipulated judgment that is what the tribe got to get recognition from the government. The judgment... You say that's... The judgment did not establish tribal membership. What it established was, first of all, the recognition of a tribe, reinstatement of the recognition of a tribe. And secondly... Did you say what was being recognized? The federal recognition, in other words, that this group would regain its status as a federally recognized tribe. And thirdly, the recognition of a tribe that was terminated by Congress in 1959. That was the point of purpose. Well, they say they're a member of that group. But that was not part of the judgment. In other words... Okay. But I will say, I will say that the other part of that judgment, when they established a class for that case, was to the extent that individuals were entitled to benefit from the United States, as opposed to from the tribe, that the class was what that class was. But I don't believe it established, and the government did not recognize it or interpret that document as establishing membership for the tribe. Okay. I'm not quite sure. Does that distinction really work, benefit from the United States rather than from the tribe? It seems that they would benefit as members of the tribe and through the tribe from the United States. Aren't you trying to separate the inseparable there? I'm sorry. You've drawn a line. You say this group was designed to benefit from the United States. You mean in terms of its reinstatement of a federally recognized tribe? Right. Certainly at that time, it was seeking to... You made the distinction. Right. What was the distinction you were trying to make? I believe the question that had been posed was that the tribe, why did the tribe want to be federally recognized? Why was this happening? Was it because gaming was coming to the forefront? There was a group that was part of this whole business, right? That's correct. And what was the purpose of identifying that group? To extend federal tribal recognition in the Table Mountain versus Wild Food as a tribal entity. To get certain benefits. Correct. From the United States. See, that's why I think you're making a distinction that might not work. What do you mean from the United States? It's as members of the tribe. Through the tribe, they get their benefits. Right. They get the membership. Excuse me. They get the benefits through the tribe. Right. That's why I don't think the distinction that you were making works. Well, never mind. Okay. Well, I think we understand your position. Are there any further questions? Thank you. Thank you. Very briefly, this is about money. It's about money with respect to the people that won't let my clients on. Table Mountain, unlike the Santa Clara Pueblo, it consists of 60 acres northeast of Fresno. 40 acres is a casino. My clients cannot go on the burial grounds of their relatives, the burial grounds on the 20 acres. The only thing they can do is take out their wallets and go into the casino. That's the only place my clients can go. It's up to $30,000 a month now, Your Honor, to each one of these members. The tribal council consists of my client's aunt, Leanne Walker Grant. Hi, Aunt Leanne. Won't acknowledge her. That is the objectivity of this tribal council. Secondly, starting at pages 54 of my opening brief with citations to the excerpt of record, which I received from Ms. Luther as part of our FOIA request, it shows each and every involvement of the Bureau of Indian Affairs in the Table Mountain government. In fact, in September 28, 2001— What document are you referring to now? I'm sorry. The opening brief, I summarize them, and then I'm referring to excerpts of record. There's a September 28, 2001 letter, excerpt of record 89, from the BIA to the chairperson of the Table Mountain Rancheria stating in part, this is to acknowledge that on September 26, 2001, the branch of Indian Self-Determination received your request to transfer the following responsibilities of enrollment back to the Bureau of Indian Affairs for fiscal year 2002. All activities related to certification of lineal descendant, preparation of certificates of degree of Indian blood, membership cards, and other documents. The next request on pages 90-96 is this billionaire tribe requesting from the government $169,000 to assist this poor tribe with their water supply and their septic system for their casinos. What this non-involvement, this non-recognition of my client's member means, it's not the gambling. It's not all the gambling profits. The federal government, us taxpayers are paying recognized members of the tribe for health care, dental care, child welfare, college educations. Now, the other thing that's extremely important... And some of these people are not getting the $30,000 a month. 62 of them. 62 of them. 62 and counting. They're recognized members of the tribe by the United States and they're getting these benefits. The ones that recognize themselves as members are the ones getting the government benefits and the gaming profits. Not my clients, not the 62. There's like 74 that have been enrolled, that were recognized. My clients were members when they were born. It's inherent. It's irrefutable. Were they born before the... I haven't got the lingo right, but before they were unrecognized? Well, they were juveniles. In fact, two of them, the oldest one, Kathy Lewis, just turned 40. Okay, so she was like 19. She was a juvenile when the action Table Mountain versus Watts started. As part of my excerpt of record is the class... What I'm not clear on is when the Bureau of Recognize... Reinstated the tribe, all right? Yes. Okay, how many people were members of the tribe? That's the problem. I'm just asking you... Well, the thing is they won't tell us. We hear through the grapevine there's 74, 72 members, and they just made an 18-year-old granddaughter of the tribal chairman a member with $30,000 a month. Well, I mean, when they Bureau reinstated the tribe, you mean to say that... In 1980. In 1980, they had no idea how many people were out there? 100, 200, a million, 200,000? The relatives did. The class certification, which your honors will see in the excerpt of record, shows who they... I'm asking you whether the Bureau of Indian Affairs did. Bureau of Indian Affairs knew who were the distributies on the base roll and those that were listed then as dependents of the distributies. My client's father was listed as a dependent, so they knew him. But the other very important thing is... Well, how did they know the number? I mean, people at that time wanted to be tribal recognition so they could get benefits from the government. Correct. So the government recognizes a group and doesn't know whether there's 100,000 people or 10 people. Is that what you're saying? That's what they claim. Well, I'm asking you what you're saying. Well, what I'm saying is that the class was certified by Table Mountains Council to consist of all those, we will send notices to those persons whose addresses we know. My client's father was listed on there, and he never got a notice. So the BIA says it doesn't know. But what happened is after Table Mountain v. Watt got together, it was like a group of Michael Douglases in Star Chambers. We appoint ourselves the tribe. Okay. We'll have to live within the record. You have more than used your time. And I would ask the Court to look at Excerpt of Record 86-88. That is the BIA's disapproval of Table Mountains Constitution, saying you have to comply with Table Mountain v. Watt. Thank you. You have. Thank you very much. Thank you. The case just argued is submitted for decision. Are there counsel here in the first case, Ventura-Packers? All right. We'll hear the first case. Well, no, wait. Maybe we should hear the first case. Okay. We'll go ahead and hear Ventura-Packers v. Englund. Good morning, Your Honor. Good morning. Thank you for accommodating me.
judges: Schroeder, Pregerson, Trott